IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOSE LUIS RODRIGUEZ PORTILLO, )
)
   Petitioner, )
)
v. )  No. 1:18-cv-470 (LMB/MSN)
)
RUSSELL HOTT, et al., )
)
   Respondents. )

## MEMORANDUM OPINION

  Petitioner Jose Luis Rodriguez Portillo ("petitioner" or "Rodriguez") has filed an

application for withholding of removal with the appropriate immigration authorities, in which he

seeks to stop the government from removing him to El Salvador. According to Rodriguez, if he

is returned to El Salvador, he would be perceived as a gang member and face a substantial risk of

being tortured or killed because he has a variety of artistic tattoos on his body. For the past

fourteen months, Rodriguez has been detained in immigration custody while the immigration

courts adjudicate his application for withholding of removal. Throughout this detention,

Rodriguez has never received an individualized bond hearing because respondents believe that

his 2011 conviction for felony grand larceny, for which Rodriguez served a prison sentence of 30

days, renders him subject to mandatory detention under 8 U.S.C. § 1226(c).

  In this habeas petition filed under 28 U.S.C. § 2241, Rodriguez challenges his continued

detention in immigration custody without a bond hearing as a violation of due process. Both

Rodriguez and respondents Russell Hott, Field Office Director, U.S. Immigration and Customs

Enforcement ("ICE"), and Jefferson B. Sessions III, United States Attorney General,

(collectively, "respondents") have filed motions for summary judgment, which are now before

the Court. For the reasons that follow, respondents' motion will be denied, Rodriguez's motion will be granted, Rodriguez's habeas petition will be granted in part and denied in part, and respondents will be ordered to provide Rodriguez with an individualized bond hearing.

## I. BACKGROUND

Rodriguez, who is a native and citizen of El Salvador, first unlawfully entered the United States in 2007 after his cousin was murdered and his aunt received death threats in El Salvador. Pet. [Dkt. No. 1] ¶ 6. After arriving in this country, he was convicted in 2010 of concealing merchandise, a misdemeanor, and in 2011 of grand larceny, a felony. Id. For the first conviction, he received a sentence of 30 days imprisonment, all of which was suspended, and for the second conviction, he received a sentence of three years imprisonment, with two years and eleven months suspended. Id. After serving the latter sentence, he was deported. Id.

Rodriguez alleges in his petition that after he returned to El Salvador, he had several encounters with gang members and police that placed him in fear for his safety. Pet. Ex. 5 [Dkt. No. 21] 2. On one occasion, while boarding a bus, he was approached by gang members who demanded that he remove his shirt so they could determine whether he had tattoos. Id. at 2-3. On another occasion, police officers approached Rodriguez and his friends while they were in a park, searched Rodriguez for tattoos, and then detained him for approximately two hours and beat him with police batons, breaking his hand. Id. at 3, 5. Lastly, Rodriguez was approached by gang members who asked him about his tattoos and demanded that he either join their gang or leave the country. Id. at 3.[1] As a result of these encounters, Rodriguez unlawfully returned to the United States in August 2012. Pet. Mem. [Dkt. No. 16] 2.

---

[1] According to expert evidence introduced by Rodriguez during his withholding-only proceedings, artistic tattoos are rare in El Salvador, which has resulted in society, including both police officers and gang members, assuming that anybody with tattoos has some gang affiliation.

Since his return to the United States, Rodriguez has been convicted of two traffic-related criminal acts. In October 2014, he was convicted of driving without a driver's license, for which he was fined. Resp. Ex. 1 [Dkt. No. 7-1] ¶ 14. In July 2016, he was convicted of driving under the influence of alcohol ("DUI"), for which he was sentenced to 30 days imprisonment, with 25 days suspended. Id. ¶ 15. After he was released from local custody for the DUI conviction, he was taken into ICE custody on August 31, 2016; transferred to the custody of the United States Marshals Service; and prosecuted in this court for illegal reentry. Id. ¶¶ 18-20. He pleaded guilty and was sentenced to nine months imprisonment. After serving that sentence, he was transferred back into ICE custody on April 20, 2017. Id. ¶¶ 20-21; Resp. Reply 3 n.1. Because Rodriguez had expressed a fear of returning to El Salvador, his case was referred to the United States Citizenship and Immigration Services' Arlington Asylum Office ("Asylum Office"). Resp. Ex. 1, at ¶ 21. On May 12, 2017, the Asylum Office determined that Rodriguez had expressed a reasonable fear of persecution or torture if he were returned to El Salvador and referred the case to the Immigration Court for withholding-only proceedings. Id. ¶ 22.

Throughout the summer and fall of 2017, the Immigration Court conducted withholding-only proceedings: Rodriguez filed his application for withholding on June 13, 2017; he appeared via videoconference for his initial master calendar hearing on June 20, 2017; and he appeared via videoconference for his merits hearing on October 19, 2017 (after the court sua sponte rescheduled the hearing from August 30, 2017). Id. ¶¶ 23-26. On October 25, 2017, the parties presented closing arguments to the Immigration Judge ("IJ") and, on December 13, 2017, the IJ issued a decision granting Rodriguez's application for withholding of removal on the ground that

Pet. Ex. 5, at 3. As a result of this assumption, Salvadoran police have reverted to tattoo-based profiling, and since Rodriguez was last in El Salvador, individuals with tattoos are "consistently harassed, detained, and subjected to police brutality." Id. Moreover, there has recently been a reemergence in El Salvador of "clandestine death squads that kill suspected gang members." Id.

Rodriguez had "established a clear probability [that] his life or freedom would be threatened in El Salvador on account of his membership in [the] cognizable particular social group" of "Salvadoran males perceived to be gang members by virtue of their tattoos." Id. ¶¶ 26-27; Pet. Ex. 5, at 8, 11. The government appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). Id. ¶ 27. On May 31, 2018, the BIA sustained ICE's appeal, finding that the IJ's decision was clearly erroneous because the proposed social group was not cognizable, Rodriguez had not established a likelihood of persecution on account of his membership in the proposed social group, and Rodriguez had not established that the Salvadoran government was unwilling or unable to protect him. Resp. Reply 3; Resp. Ex. 4. Accordingly, the BIA remanded the record to the IJ for an initial determination on Rodriguez's alternative request for protection under the Convention Against Torture. See id.

While Rodriguez was in ICE custody, this Court determined as a matter of statutory interpretation in Diaz v. Hott, 297 F. Supp. 3d 618 (E.D. Va. 2018), appeal filed, No. 18-6419 (4th Cir.), that individuals who, like Rodriguez, are in withholding-only proceedings are detained under 8 U.S.C. § 1226, not under 8 U.S.C. § 1231. This distinction is important because § 1231 provides for mandatory detention, but § 1226 generally provides for bond hearings, with the caveat that § 1226(c) requires the detention of certain "criminal aliens." Accordingly, in Diaz, which was certified as a class action habeas petition, the Court ordered ICE to provide bond hearings for all class members who were not subject to mandatory detention under § 1226(c) and to provide hearings under In re Joseph, 22 I. & N. 799 (BIA 1999), for all class members who ICE determined were subject to § 1226(c)'s mandatory detention provisions.[2] During oral argument on the present motions, ICE counsel advised the Court that approximately ten class

---

[2] At a Joseph hearing, a detainee can challenge his classification as subject to one of the categories of criminal aliens listed in § 1226(c) but cannot otherwise request bond.

members had been released on bond after receiving this individualized bond review. Pursuant to the order in Diaz, Rodriguez received a Joseph hearing on April 4, 2018, and the IJ found that he was subject to mandatory detention because of his conviction for grand larceny. Resp. Ex. 1, at ¶ 35.

The present habeas petition followed. Rodriguez primarily argues that the Due Process Clause prohibits his prolonged detention without an individualized bond hearing to assess whether he is a flight risk or a danger to the community.[3] Accordingly, Rodriguez requests that the Court either order his release or order that he be provided with a bond hearing before an IJ or a magistrate judge (and retain jurisdiction to review those proceedings). Pet. 9. In addition, Rodriguez requests that the Court specify that the government bears the burden of proof at the bond hearing by clear and convincing evidence. Pet. Mem. 15-16. The parties have now filed cross-motions for summary judgment.

## II. DISCUSSION

### A. **Standard of Review**

A party is entitled to summary judgment if the party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if and only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In general, bare allegations or assertions by the nonmoving party are not sufficient to generate a genuine dispute; instead, the nonmoving party must produce

---

[3] Rodriguez also argues that mandatory detention does not apply to him as a matter of statutory interpretation because his current ICE detention did not begin immediately after he was released from criminal custody related to the grand larceny charge; however, Rodriguez recognizes that this claim "is not presently viable because the Fourth Circuit has held that the statute does not require detention immediately upon release from criminal custody" and he presents the claim only to preserve it. Pet. ¶ 28. Accordingly, the Court will not address this argument.

"significantly probative" evidence to avoid summary judgment. Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 929-30 (4th Cir. 1990) (quoting Anderson, 477 U.S. at 242). That being said, in ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in her favor. Anderson, 477 U.S. at 255.

## B. Analysis

Because the parties agree that Rodriguez is statutorily subject to mandatory detention during the pendency of his withholding-only proceedings, the central question presented by his habeas petition is deceptively simple: What, if any, due process limitations are there on mandatory detention of aliens in withholding-only proceedings? Because the Supreme Court has previously addressed a nearly identical question in Demore v. Kim, 538 U.S. 510 (2003), it is useful to begin with an examination of that opinion.

In Demore, Hyung Joon Kim ("Kim"), the alien in question, who was a lawful permanent resident, had been placed in removal proceedings after being convicted of two theft-related offenses which rendered him subject to mandatory detention under § 1226(c) during the removal proceedings. Demore, 538 U.S. at 513-14. He filed a habeas petition challenging the constitutionality of the mandatory detention under due process principles, which petition the Supreme Court denied. As an initial matter, the Supreme Court explained that Congress has broad power over immigration decisions, and in the immigration context, Congress often makes rules that would be unacceptable if they were applied to citizens. Id. at 521. Accordingly, even though it is clear that the Fifth Amendment applies to aliens and entitles them to some measure of due process in deportation proceedings, the Supreme Court has long "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." Id. at 523. In particular, the Supreme Court explained that it had previously upheld the use of bright-

6

line legislative and administrative rules concerning detention that are based on reasonable presumptions, rather than on any individualized assessments. Id. at 523-26. Accordingly, the Court determined that it was constitutional for Congress to require the detention of criminal aliens to ensure that those aliens appeared for their removal hearings and did not harm the community while awaiting removal. See id. at 518-21.

As the Demore Court observed, this decision was in some tension with its previous decision in Zadvydas v. Davis, 533 U.S. 678, 688-90 (2001), in which the Court had determined that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem" and had therefore read an implicit limitation into a different immigration detention statute as a matter of constitutional avoidance. The provision at issue in Zadvydas, 8 U.S.C. § 1231(a)(6), applied to part of the "removal period" scheme. Under this scheme, once a final order of removal was entered against an alien, the government was required to detain the alien for a 90-day "removal period" during which the government was supposed to arrange for and execute the alien's deportation. If the alien was not deported during that 90-day period, § 1231(a)(6) provided that certain aliens "may be detained beyond the removal period."

According to the Zadvydas Court, government detention violates due process "unless that detention is ordered in a criminal proceeding with adequate procedural protections" or "in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. at 690 (internal quotation marks and citations omitted). Although the government argued that the detention provision was intended to ensure the appearance of aliens at future immigration proceedings and prevent the community from being endangered, the Court concluded that neither of these rationales was "sufficiently strong" to justify "indefinite

civil detention." Id. In particular, the Court determined that the first rationale was "weak or nonexistent" in cases that stretched far beyond the removal period where "removal seems a remote possibility at best" and that the second rationale has only been allowed to justify preventive detention "when limited to specially dangerous individuals and subject to strong procedural protections." Id. at 690-91. Moreover, the Court emphasized that in "cases in which preventive detention is of potentially indefinite duration," the dangerousness rationale must "be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." Id. at 691. With respect to the specific provision at issue in Zadvydas, the Court determined that it applied "broadly to aliens ordered removed for many and various reasons" rather than "narrowly to a small segment of particularly dangerous individuals" and that there were no related special circumstances to authorize indefinite detention. Id. at 691-92 (internal quotation marks omitted). Moreover, the Court observed that the statute did not provide significant procedural protections because the only protection available was a judicially-unreviewable administrative proceeding where the alien bore the burden of proving that he was not dangerous. Id. at 692. Given all of these considerations, as well as the importance of the liberty interest at stake and the long recognition of the "important constitutional limitations" on Congress's power to legislate in the immigration area, the Court determined that there was a serious question about whether the Constitution allowed for the indefinite detention of aliens. Id. at 692-96.

Based on this determination, the Court read an implicit limitation into the statute and concluded that "once removal is no longer reasonably foreseeable, continued detention is no

longer authorized by statute." Id. at 699.[4] For reasons of practicality, the Court also set out a framework for evaluating claims by aliens detained under § 1231(a)(6):

> While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. See Juris. Statement in United States v. Witkovich, O.T.1956, No. 295, pp. 8-9. Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

Id. at 701.

In Demore, the Court distinguished the Zadvydas holding in two respects. First, it observed that unlike the detention at issue in Zadvydas, detaining aliens under § 1226(c) during the pendency of removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." Demore, 538 U.S. at 527-28. Second, it explained that Zadvydas was concerned with indefinite and potentially permanent detention, but that detention under § 1226(c) was significantly shorter. In particular, the Court observed that § 1226(c) detention has a "definite termination point"—the end of

---

[4] The Court apparently believed that once removal was no longer foreseeable, detaining the alien would no longer advance the statute's purpose of ensuring that the alien appear for deportation and so Congress would have reasonably intended to limit the detention authority at that point. See Zadvydas, 533 U.S. at 699 (citing the maxim that "the rationale of a legal rule no longer being applicable, that rule itself no longer applies"). Accordingly, although the analysis in Zadvydas was informed by due process principles, the specific limitations that the Court read into § 1231(a)(6) were based on statutory interpretation.

removal proceedings—and that statistics show that the average detention time under § 1226(c) is only approximately 47 days when the alien does not appeal and five months when the alien does appeal. Id. at 529-30.[5] Accordingly, the Court concluded that the detention of an alien under § 1226(c) "for the limited period of his removal proceedings" is constitutionally permissible. Id. at 531.

Justice Kennedy concurred in Demore, explaining that in his view, "a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." Id. at 532 (Kennedy, J., concurring). In particular, Justice Kennedy observed that if there were "an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Id. at 532-33. Justice Kennedy's position suggests that there would be serious due process concerns if the detention in question is not reasonably related to facilitating deportation but instead appears to be punitive.

Although the Demore Court was not entirely clear about the specific due process principles on which it was relying, the most reasonable interpretation of Demore is as an application of the framework laid out in Zadvydas, which allows civil detention "in certain

---

[5] As this Court has previously observed, the data relied upon in Demore was inaccurate because the government provided incorrect information about the average time to completion in cases where an alien did not appeal and about the average time for appeal. Haughton v. Crawford, 2016 WL 5899285, at *6 (E.D. Va. Oct. 7, 2016). The government clarified in August 2016 that the total average time to completion in cases where the alien appealed was 382 days (approximately thirteen months, rather than five months) in 2001. Id. In addition, it is important to observe that these statistics do not encompass the specific withholding-only proceedings at issue in this habeas petition, which have already exceeded fourteen months and are estimated conservatively to last at least another six months.

special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." Zadvydas, 533 U.S. at 690 (internal quotation marks and citations omitted). In Demore, as the Court made clear, the "special justification" that outweighed the liberty interest at stake was the interest in ensuring that the alien would be successfully removed if a final order of removal were eventually entered. In addition, the Court believed that the liberty interest at stake in Demore was substantially curtailed because the proceedings were typically relatively short: approximately a month in the vast majority of cases, and approximately five months if the alien chose to appeal. It appears as if the Court's weighing of these two interests against each other is what resulted in the ultimate holding that Kim was not constitutionally entitled to a bond hearing.

In addition, understanding Demore as applying the balancing test articulated in Zadvydas rather than as establishing a bright-line rule justifying detention under § 1226(c), regardless of the length or circumstances, is consistent with how the Due Process Clause has traditionally been understood. See, e.g., Mathews v. Eldridge, 424 U.S. 319 (1976) (establishing a procedural due process balancing test in recognition of the "flexible" nature of due process protections); United States v. Salerno, 481 U.S. 739, 748 (1987) (rejecting the argument that the Due Process Clause establishes a "categorical" rule prohibiting pretrial detention on the basis of dangerousness and instead recognizing the longstanding rule that due process requires the balancing of the government's "regulatory interest in community safety" against the "individual's liberty interest"); Addington v. Texas, 441 U.S. 418, 425 (1979) (balancing "the extent of the individual's interest in not being involuntarily confined indefinitely" against the "state's interest in committing the emotionally disturbed under a particular standard of proof" in the context of

assessing "what standard should govern in a civil commitment proceeding"). This history of understanding the guarantees of due process in terms of balancing the government's and the individual's interests pushes strongly in favor of reading Demore as an application of the Zadvydas test rather than as establishing a new categorical rule. Lastly, Justice Kennedy's Demore concurrence, which concluded that unreasonable delays in immigration proceedings might require an inquiry into whether the detention "is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons," suggests that he read the Demore majority opinion as also applying the Zadvydas test, which draws a distinction between "nonpunitive" civil detention, which may be justified by special circumstances, and punitive criminal detention, which may only occur after adequate criminal process.[6] This understanding only reinforces this Court's interpretation of Demore and confirms that the Zadvydas framework should be applied to Rodriguez's circumstances.

In applying these principles, it is clear that the balance of the interests falls somewhere between Zadvydas and Demore. Unlike in Zadvydas, where the government's interest in ensuring the aliens' successful removal was severely diminished because it appeared that the government would not be able to deport them in the reasonably foreseeable future, the withholding-only proceedings in this case are ongoing. Although there does not appear to be a specific timeline to guide those proceedings, there is a definite termination point to them and the government maintains an interest in ensuring Rodriguez's deportation if it is successful in

---

[6] In other words, Justice Kennedy's concurrence suggests that he understands the Demore majority as implicitly holding that detention under § 1226(c) is nonpunitive civil detention, which may be justified by the special circumstance of ensuring that aliens appear for their deportation proceedings, at least as long as the detention is relatively brief; however, he believed that if the government unreasonably extended the deportation process in a particular case to result in unnecessarily long detention, that might suggest that the detention was meant to be punitive, which could not be so justified.

defeating his withholding-only claim. On the other hand, unlike the detentions referenced by the Court in Demore, Rodriguez's detention has stretched considerably longer than the averages cited in that opinion, including the six months Kim served which the majority described as "longer than the average." Demore, 538 U.S. at 531. At this point, he has been in continuous ICE custody for more than fourteen months, and the burden on his liberty interest is concomitantly greater than the burden described in Demore. Accordingly, neither Demore nor Zadvydas fully answers the question of how to balance the interests at stake, leaving this Court to engage in its own balancing of the government's interest in detaining Rodriguez without a bond hearing to ensure his appearance at future proceedings and to protect the community against Rodriguez's liberty interest in not being subject to extensive civil detention without having had an individualized bond review.[7]

---

[7] The government argues that two district courts in other circuits have "resolved in the government's favor as-applied constitutional challenges to detentions exceeding the length of" Rodriguez's detention. Gov't Reply 5-6 (citing Coello-Udiel v. Doll, No. 3:17-cv-1414, 2018 WL 2198720 (M.D. Pa. May 14, 2018); and Manley v. Delmonte, No. 17-cv-953, 2018 WL 2155890 (W.D.N.Y. May 10, 2018)). Neither of these cases represents authority binding this Court and neither case includes analysis of the interaction of Zadvydas and Demore that persuades the Court to adopt the government's position. In addition, at least two other district courts after Jennings have granted relief to the alien. In Sajous v. Decker, No. 18-cv-2447, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018), the court determined that due process required a balancing test and, in that case, the court considered the length of detention, whether the alien or the government was responsible for any delay, and whether the alien had asserted defenses to removal (with any asserted defenses weighing in favor of a bond hearing because they reduce the chance that the alien will eventually be removed). The court also stated that other factors may be relevant, including whether the civil detention exceeds the time spent in criminal detention. Id. Applying those factors to the case before it, the court determined that the alien was entitled to a bond hearing because he had been detained for longer than eight months, much of the delay was attributable to immigration officials, and he had asserted several defenses to removal. Id.; see also Mohamed v. Secretary Dep't of Homeland Security, No. 17-5055, 2018 WL 2390132 (D. Minn. May 25, 2018) (adopting a Report and Recommendation that had applied a fact-based balancing test to determine that an alien, who had been detained for fifteen months pursuant to § 1226(c), was entitled to a bond hearing).

This Court has previously "surveyed the analysis employed in other circuits" and identified "five factors that recur across these cases" that "bear on the reasonableness of an alien's detention" without being afforded a bond hearing. Haughton, 2016 WL 5899285, at *8. Although these factors were originally adopted in the context of reading an implicit reasonableness limitation into § 1226(c), they also represent a reasonable framework for balancing the due process interests at stake in this petition. The five factors are: "(1) the duration of detention, including the anticipated time to completion of the alien's removal proceedings; (2) whether the civil detention exceeds the criminal detention for the underlying offense; (3) dilatory tactics employed in bad faith by the parties or adjudicators; (4) procedural or substantive legal errors that significantly extend the duration of detention; and (5) the likelihood that the government will secure a final removal order." Id. (citations omitted).

To begin with the first factor, which "is the most important," id. at *9, Rodriguez has already been detained in ICE custody for more than fourteen months. Although the duration inquiry does not admit of "hard and fast parameters, courts seem to agree that the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past [the one and a half month average and five month maximum] thresholds cited by the Supreme Court in Demore." Id. (internal quotation marks omitted) (alteration in original). This approach also aligns with the concerns expressed in Zadvydas about detention in excess of six months. Moreover, at least one other court has contemplated the "outer limit of reasonableness" and determined that "a criminal alien's detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case." Sopo v. United States Att'y Gen., 825 F.3d 1199, 1217 (11th Cir. 2016), vacated as moot, 890 F.3d 952 (11th Cir. 2018). Accordingly, Rodriguez's fourteen-month detention weighs heavily in his favor

14

as a prolonged and substantial burden on his liberty interest. This finding is enhanced by the potential for significant additional proceedings, which the parties conservatively estimated at oral argument will take at least six additional months, given the BIA's recent determination that the IJ's initial decision was clearly erroneous.

The second factor, which compares the duration of detention in ICE custody to the length of time served on the criminal sentence, also weighs in Rodriguez's favor. For the criminal conviction on which his current mandatory detention rests, Rodriguez was sentenced to three years imprisonment but had two years and eleven months suspended and, therefore, he ultimately served one month in prison. Cf. Haughton, 2016 WL 5899285, at *9 (examining the time that the alien actually spent in criminal custody rather than just the full length of the sentence imposed). Accordingly, Rodriguez has now been civilly detained as a result of his criminal conviction for more than fourteen times as long as he was criminally detained for that same conduct, and this factor weighs in his favor.

The third factor considers any dilatory tactics by the parties or the adjudicators. This factor does not appear to favor either party. Although the proceedings have been ongoing for a relatively long time, the delays do not appear to have been unreasonable. The only substantial continuance was ordered by the IJ sua sponte, apparently because the IJ who was initially presiding over the case was transferred to a different Immigration Court and the IJ to whom the case was reassigned simply rescheduled the hearing on the first available date on her docket. Resp. Reply 9-10. Accordingly, neither party nor the adjudicator appears to have engaged in unreasonable or bad faith delays.[8]

---

[8] At the same time, even though neither party has delayed the proceedings in bad faith, the excessive length of Rodriguez's detention brings into sharp focus the potential length of the

The fourth and fifth factors, which examine potential legal and factual errors in the proceedings and the likelihood of a final removal order, both weigh somewhat in favor of the government. At this point, nearly half of the time Rodriguez has been detained occurred while the government appealed the IJ's initial decision to the BIA, and the BIA ultimately held that the IJ's decision was in error. As a result, the IJ's apparent legal errors in Rodriguez's favor contributed to some of his detention. In addition, although there will be additional proceedings in front of an IJ, as well as further appeals to the BIA and possibly an appeal to the Fourth Circuit, the current prospects for Rodriguez to succeed on his application for withholding of removal do not appear especially strong. Accordingly, these factors weigh in favor of the government.

Taken together, the factors are almost evenly split between the two parties when weighing Rodriguez's due process liberty interest against the government's legitimate, nonpunitive interest in ensuring that he can be successfully deported if his application for withholding of removal is denied. That being said, this Court and other courts have described the first factor, which looks at the length of detention, as the most important, and Rodriguez has been detained for significantly longer than the one-, five-, and six-month boundaries described in Zadvydas and Demore. Moreover, the government's interest in guarding against Rodriguez's flight can be substantially protected even if Rodriguez is given an individualized bond hearing and released on bond because a critical factor that the IJ will be forced to consider is whether Rodriguez is a flight risk and whether there are conditions of release that could reasonably secure his future appearance. Accordingly, the balance of these interests weighs in favor of Rodriguez.

Once the Court has determined that due process demands that Rodriguez receive an individualized inquiry into whether his continued detention fulfills the purposes of the statute,

---

average withholding-only proceeding, which militates in favor of allowing individuals in Rodriguez's position to receive an individualized bond determination.

the question remains as to what procedures apply to the bond hearing. In <u>Haughton v. Crawford</u>, 221 F. Supp. 3d 712, 714 (E.D. Va. 2016), this Court determined that, in light of the ongoing infringement of the alien's liberty interest and the strong tradition that the burden of justifying civil detention falls on the government, the "balance between individual and government interests requires that the burden of justifying petitioner's continued detention falls upon the government," which had to "demonstrate by clear and convincing evidence that petitioner's ongoing detention is appropriate to protect the community and ensure petitioner's appearance at future proceedings." <u>Id.</u> at 717. This decision remains good authority[9] and is, in any event, persuasive on the merits. Accordingly, at the bond hearing, the government must demonstrate that Rodriguez is either a flight risk or a danger to the community by clear and convincing evidence.

Lastly, in his petition, Rodriguez requests that the Court maintain jurisdiction to review the result of any bond hearing. This Court has previously decided similar habeas petitions without maintaining jurisdiction over the matter. <u>See, e.g.</u>, <u>Haughton</u>, 221 F. Supp. 3d 712. Moreover, 8 U.S.C. § 1226(e) provides that no "court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." Given this statutory provision, the Court will reject petitioner's request, which he has not renewed in his motion for summary judgment.

---

[9] The government argues that "intervening authority makes clear that the burden must remain with the alien" because both the majority and the dissent in <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830 (2018), indicated that the lower court's requirement of procedural protections that go beyond those authorized by the statute and existing regulations was untenable. That case is inapposite because both the majority and the dissent were focused on whether 8 U.S.C. §§ 1225, 1226 could reasonably be read to require bond hearings. As such, both opinions focused on the protections required by the statute and did not reach the constitutional question. Because the Court has now determined that Rodriguez's continued detention, although authorized by the statute, violates due process and is therefore unconstitutional, it must determine what protections are demanded by the Constitution, not what protections are authorized by the statute.

### III.   CONCLUSION

For the reasons stated above, respondents' Motion for Summary Judgment [Dkt. No. 6] will be denied, petitioner's Motion for Summary Judgment [Dkt. No. 15] will be granted, and petitioner's Petition for a Writ of Habeas Corpus [Dkt. No. 1] will be granted in part and denied in part by an Order to be issued with this Memorandum Opinion which will require respondents promptly to provide petitioner with a bond hearing at which the burden will be on the government to show by clear and convincing evidence that petitioner's continued detention is justified by risk of non-appearance or danger to the community.

Entered this 3ʳᵈ day of July, 2018.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge